NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MARTIN J., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, M.J., *Appellees*.

No. 1 CA-JV 22-0068
FILED 8-25-2022

Appeal from the Superior Court in Maricopa County
No.  JD 37863
The Honorable Sam J. Myers, Judge

**AFFIRMED**

COUNSEL

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellees, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Brian Y. Furuya and Judge Paul J. McMurdie joined.

---

**C A M P B E L L**, Judge:

¶1      Martin J. (Father) appeals the termination of his parental rights to his daughter, Mary.[1] For the following reasons, we affirm.

## BACKGROUND

¶2      Father and Valerie R. (Mother) are the parents of six children, including Mary, who was born in 2007.[2] In August 2019, the Department of Child Safety (DCS) learned that five of the children, including Mary, had been molested by a relative living in the home. Mother knew about the abuse but failed to protect the children from the abuser. At that time, Mother was unemployed and lacked stable housing. Father had been deported to Mexico in 2012. Following his removal, he had little contact with the children and did not provide for their basic needs. Based on this information, DCS took custody of the children and petitioned for a dependency, which the superior court granted.

¶3      For several months, DCS could not locate Father. He then contacted the case manager and confirmed he lived in Mexico but lacked stable housing. Because of his deportation, Father could not visit Mary in Arizona, so DCS provided weekly supervised phone visits. DCS later allowed him to contact Mary at her group home "whenever he had availability." Father later obtained stable housing and DCS conducted a home study and determined his home to be appropriate for reunification with the children. Based on this information the court returned Mary's siblings to Father in Mexico. During the process, DCS discovered that Mary's parentage had not been established. Mary, who had been placed with a foster family in July 2021, continued to live with the family while

---

[1]      Pseudonyms are used to protect the identity of the minor child.
[2]      The superior court terminated Mother's parental rights, and she is not a party to this appeal.

Father obtained proof of his parentage. The paternity testing eventually confirmed he is Mary's biological father.

¶4 During this period, Father's calls with Mary were inconsistent and brief. Father did not attend any team meetings and was not up to date about her medical- and behavioral-health needs. After Mary's siblings were placed with Father, he initially failed to ensure they had behavioral-health services or medication. Two of the children ran away, and one attempted suicide.

¶5 Ultimately, DCS moved to terminate Father's parental rights to Mary under the fifteen-month out-of-home placement ground. A.R.S. § 8-533(B)(8)(c). At the termination hearing, Father testified that he moved to a new house near the United States border, and all but one of Mary's siblings lived with him, attending school across the border in New Mexico. However, Father had only secured school counseling for some of Mary's siblings and reduced one of the children's medications without consulting a doctor.

¶6 The case manager testified that, contrary to Father's claim, DCS believed the siblings were still living with various family members in New Mexico. The case manager also testified that Father had failed to establish a meaningful relationship with Mary, she had significant mental- and behavioral-health needs, and she did not trust Father to keep her safe and wished to be adopted. After conducting a hearing, the superior court terminated Father's parental rights, and he timely appealed.

**DISCUSSION**

¶7 Father challenges the sufficiency of the evidence supporting the court's termination order. A parent's right to custody and control of his child, while fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11–12 (2000). Severance of a parental relationship may be warranted where the state proves one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* at 249, ¶ 12. "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284–85, ¶ 25 (2005). The court must also find that severance is in the child's best interests by a preponderance of the evidence. *Id.* at 288, ¶ 42.

¶8 This court "will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). This Court does not reweigh

the evidence, but "look[s] only to determine if there is evidence to sustain the court's ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

**¶9**      The superior court may terminate a parent's parental rights under the fifteen-months out-of-home placement ground if (1) DCS "has made a diligent effort to provide appropriate reunification services," (2) the child has been "in an out-of-home placement for a cumulative total period of fifteen months or longer pursuant to a court order," (3) "the parent has been unable to remedy the circumstances that cause[d] the child to be in an out-of-home placement," and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c). The "[c]ircumstances" are those existing at the time of the termination hearing. *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007).

**¶10**      Father argues the superior court failed to identify his role in the circumstances causing Mary's out-of-home placement, and for that reason, the record does not show he is unfit to parent her. Similarly, Father asserts the case manager did not testify about safety concerns or barriers to reunification, but rather testified only about Mary's subjective beliefs and reluctance to reunify with Father, which cannot support a termination order. *See Desiree S. v. Dep't of Child Safety*, 235 Ariz. 532, 534, ¶ 11 (App. 2014) (A child's subjective belief that a parent cannot keep him safe, without more, "cannot be the sole basis to determine as a matter of law that [the parent] will be unable to parent him in the near future.").

**¶11**      Here, the record belies Father's assertions. The superior court clearly identified the circumstances causing Mary to be placed outside of the home and the circumstances preventing reunification, which were based on Father's actions and not Mary's subjective beliefs. The court found the main issue preventing reunification was Father's failure to establish a meaningful parent-child relationship with Mary.

**¶12**      Father had not parented Mary since she was five years old. At the time she was placed in DCS custody, he had little contact with her for almost seven years. During that time, Father did not provide for her financial or emotional needs. Father did not try to gain or enforce custody or parenting time, and he failed to protect Mary from Mother's neglect. When Mary was 11 and entered DCS custody, Father had no parental connection with her whatsoever.

¶13        Over the next thirty-one months, Father made only marginal attempts to build a parental relationship with Mary. Father did not often avail himself of the unfettered opportunity to have phone contact with Mary while she was in a group home. When he did contact her and they would disagree, Father quit communicating for weeks. Once Mary was placed with her foster family, Father did not call for about four months and failed to maintain consistent contact thereafter. The calls he did make were short in duration and superficial in nature. This lack of connection was further illustrated during trial when Father could not recall Mary's birth date, her age, or what grade she had achieved in school. Father could not identify Mary's mental- and behavioral-health needs. The court went on to find that although Mary had "significant mental health needs due to the trauma she experienced during her childhood," Father "does not know much about her [mental-health treatment]."

¶14        Father argues that DCS did not share information about Mary's counseling and mental-health needs with him. The case manager's testimony belies this contention. She explained that she spoke directly with Father about Mary's mental- and behavioral-health needs. And the case manager testified that Father was invited to team meetings where DCS and Mary's providers discussed these topics but did not attend. Overall, reasonable evidence supports the court's findings that Father was unable to form a meaningful relationship with Mary and that there is a substantial likelihood he will not be capable of exercising proper and effective care and control over her in the near future.

¶15        Father also asserts the superior court erred by finding DCS made diligent efforts to provide him with appropriate reunification services. Before seeking to terminate parental rights under the fifteen-month out-of-home placement ground, DCS must make diligent efforts to provide a parent with appropriate reunification services. A.R.S. § 8-533(B)(8). DCS does so by allowing the parent the "time and opportunity to participate in programs designed to improve [the parent's] ability to care for the child." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 94, ¶ 20 (App. 2009). DCS must "undertake measures [that have] a reasonable prospect of success" in reuniting the family. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). Additionally, DCS must "maintain consistent contact with the parent[] and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23, ¶ 50 (App. 2019).

¶16        Father contends that DCS did not offer family counseling based solely on Mary's refusal to participate in the service. This assertion is

belied by testimony from the case manager who consulted Mary's therapist multiple times during the dependency to determine if family counseling was appropriate. The therapist opined, however, that family counseling would not have been helpful because the child was not emotionally ready for it. Nonetheless, DCS is not required "to undertake rehabilitative measures that are futile," *Mary Ellen C.*, 193 Ariz. at 192, ¶ 34. Nor is it required to duplicate a service the parent receives elsewhere. *See Pima Cnty. Severance Action No. S-2397*, 161 Ariz. 574, 577 (App. 1989). The record shows that DCS pursued family counseling, regardless of Mary's personal feelings on the matter, but that it was not therapeutically appropriate.

¶17 Finally, Father asserts the superior court's finding that severance was in Mary's best interests is clearly erroneous. In addition to finding a statutory ground for termination, the court must also determine what is in the best interests of the child by a preponderance of the evidence. *Kent K.*, 210 Ariz. at 288, ¶ 42. Once the court finds a parent unfit under at least one statutory ground for termination, "the interests of the parent and child diverge," and the court proceeds to balance the unfit parent's "interest in the care and custody of his or her child . . . against the independent and often adverse interests of the child in a safe and stable home life." *Id.* at 286, ¶ 35. "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance *or* be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018).

¶18 The court may find a child would benefit from termination if there is an adoption plan or if the child is adoptable, *id.*, at 150–51, ¶¶ 13–14, or if the child "would benefit psychologically from the stability an adoption would provide." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352 (App. 1994). Conversely, the court may find a child would be harmed by the continuation of the parent-child relationship "where there is clear and convincing evidence of parental unfitness, which has not been remedied notwithstanding the provision of services by [DCS] and which detrimentally affects the child's well-being." *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158 (App. 1989).

¶19 Here, the court found Mary's foster family was meeting her needs and providing a loving and nurturing home. The family intended to adopt Mary, which would provide her with stability and permanency. Additionally, the court found that continuing the parent-child relationship

between Father and Mary would be detrimental to the child. Because of a lack of a meaningful relationship with Father, he remains unable to alleviate Mary's significant concerns about her personal safety. Through testimony, Father has been unable to demonstrate his ability to obtain and maintain mental- and behavioral-services for Mary. Given that Mary was with a foster family who provides for her mental- and behavioral-health needs, provides a safe nurturing home, and plans to adopt her, the court found termination was in Mary's best interests. We agree. Reasonable evidence supports the court's finding.

¶20 Father nevertheless cites his existing relationship with Mary and his participation in services. But the court expressly considered the "semblance of a relationship between Father and [Mary]" and Father's "efforts toward[s] reunification." Ultimately the court determined that Mary's need for stability and permanency outweighed those factors. Reasonable evidence supports the court's findings, and this Court will not reweigh the evidence on appeal. *Jesus M.*, 203 Ariz. at 282, ¶ 12.

## CONCLUSION

¶21 For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA

7